# Exhibit B

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

THIS SETTLEMENT AGREEMENT AND MUTUAL RELEASE ("Agreement"), effective June 22, 2018 is made and entered into by and between Zakeni Limited ("Zakeni") and SPYR, Inc. f/k/a Eat at Joe's, Ltd. ("SPYR").

## RECITALS

WHEREAS, on October 13, 2015, Zakeni filed a suit (the "Lawsuit") in the U.S. District Court for the District of Delaware captioned *Zakeni Limited v. SPYR, Inc. f/k/a Eat at Joe's, Ltd.*, Civil Action No.1:15-CV-00926-UNA, seeking repayment by SPYR under two Convertible Debentures dated July 31, 1998 and September 2, 1998 respectively (collectively the "Debentures").   SPYR denied liability for payment under the Debentures based on multiple defenses, including expiration of the statute of limitations.

WHEREAS, Zakeni and SPYR desire to settle all claims raised in the Lawsuit and related to the Debentures and wish to avoid the cost of ongoing litigation and the uncertainty of trial.

THEREFORE, in consideration of the mutual promises and undertakings contained herein, the sufficiency of which is acknowledged by the parties, the parties to this Agreement agree as follows:

## AGREEMENT

1.      The Parties have reached this settlement in order to avoid risk, time and expense of ongoing litigation that in any way relates to or arises from or out of the Debentures and those that were or could have been raised in or are otherwise related to the Lawsuit (the "Lawsuit Matters").   As such, the execution of this Agreement and the exchange of consideration in accordance herewith shall not be in any manner construed as an admission of liability on the part of either Party; and both Parties specifically and expressly disclaim any liability or wrongdoing with respect to the Lawsuit Matters.   For clarity, the term "Lawsuit Matters" does not include (a) any obligations of a party under this Settlement Agreement and the Exhibits -hereto, (b) any transactions, agreements or arrangements entered by them after the date hereof or (c) any matters relating to Zakeni's capacity as a shareholder of the Company.

2.      Within ten (10) days from the date of execution of this Agreement by all parties, Zakeni and SPYR shall file in the Lawsuit a stipulated motion for dismissal substantially in the Form annexed hereto as Exhibit D including the required findings pursuant to Section 3(a)(10) of the Securities Act of 1933 and shall cooperate to obtain the dismissal with prejudice of all claims that were or could have been raised in the Lawsuit and providing that the Court retain jurisdiction for the purpose of enforcing this Agreement.   In the event the Court declines to award the Order (as defined below) containing the relief sought pursuant to

Section 3(a)(10) or fails to issue the Order within 120 days (or such other period agreed to by the parties) of the filing of the motion, this Agreement shall be null and void and the parties shall retain all claims, rights and defenses in the litigation.

3.      Within ten (10) business days of the entry of an Order of Dismissal With Prejudice in the Lawsuit (the "Order"), SPYR shall, pursuant to the Order, and the provisions of Section 3(a)(10) of the Securities Act of 1933 issue to Zakeni, or as it may otherwise direct, Three Million Five Hundred Thousand (3,500,000) free-trading shares of SPYR common stock (the "Shares").  The Shares shall be subject to a gating provision limiting the sale thereof on any given day to, not more than (a) the greater of (i) 10% of the prior trading day's volume or (ii) 5,000 shares during the first nine months after the date of the Order and 10,000 shares thereafter; but in any event no more than 200,000 shares per rolling 20 trading day period; or (b) such higher number to which SPYR may from time to time agree in writing.

4.      Simultaneously SPYR: (a) shall issue to Zakeni, or as it may otherwise direct, three transferable divisible warrants (each, a "Warrant" and collectively, the "Warrants") to acquire an aggregate of 3,500,000 shares of Common Stock (with a term of five (5) years ending on the last day of the month of issuance) in the form annexed hereto as Exhibit A in the following denominations:

     i.  One Million (1,000,000) shares at an exercise price of $0.25;
    ii.  One Million Five Hundred Thousand shares (1,500,000) at an exercise price of $0.50; and
   iii.  One Million shares (1,000,000) at an exercise price of $0.75;

(b) execute and deliver the Registration Rights Agreement annexed hereto as Exhibit B; and

(c) execute and deliver to its Transfer Agent, Irrevocable Instructions to Transfer Agent in form reasonably satisfactory to Zakeni (and the Company commits that, if the Company subsequently changes its Transfer Agent, the Company will re-confirm such instructions and/or issue similar instructions to such new Transfer Agent).

The Warrants shall not be exercisable prior to the date that is six (6) months following the date of the Order and shall be subject to the provisions contained in the Warrants.

5.      Upon delivery of Three Million Five Hundred Thousand (3,500,000) shares referred to in Section 3 and the Warrants and Registration Rights Agreement referred to in Section 4, the Releases by the Parties set forth in paragraph 6 below shall be effective.

6.      For and in consideration of each party's execution of this Agreement, the obligations of SPYR pursuant to Sections 3-5 hereof, and the mutual releases contained herein, the sufficiency of which is hereby acknowledged, each party does hereby release, remise and forever discharge the other party and its respective directors, officers, shareholders, employees, agents, representatives, attorneys, subsidiaries, successors and assigns, of and from any and all

claims and causes of action, which it now has, has had, or may hereafter have, and each and every claim or cause of action, that in any way relates to the Lawsuit Matters

7.    Each party hereby represents and warrants to the other that it has not heretofore assigned, sold, transferred or otherwise conveyed or purported to assign, sell, transfer or otherwise convey to any person or entity any matter released or discharged herein.  Each party agrees to indemnify, defend and hold harmless the other from and against any actions, causes of action, claims, remedies, demands, damages, charges, interest, losses, costs and expenses, including attorneys' fees, of every kind and nature whatsoever in any way arising out of or occasioned by the actual or purported assignment, sale, transfer or conveyance by that party of any matter released or discharged herein.

8.    Each person signing this Agreement represents and warrants that he/she is authorized to sign the Agreement and bind the party for whom he/she signs.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective agents, legal representatives, heirs, successors and assigns.

9.    This Agreement embodies the complete and final agreement between the parties and supersedes all previous communications between the parties with respect to the subject matter of this Agreement.  This Agreement may not be amended, modified or altered except by a written instrument signed by all parties hereto.

10.    Each party shall bear its own attorneys' fees and costs associated with the Lawsuit and all matters related to the underlying dispute and this settlement.

11.    Each party represents that it has been represented by legal counsel in the negotiation and drafting of this Agreement.  The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and the Agreement shall not be construed against any party because of such party's involvement in the preparation or drafting of this Agreement.

12.    If any provision of this Agreement or any document executed in connection with this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, such provision shall be fully severable and shall in no way affect the validity or enforceability of this Agreement or any other provision herein.

13.    This Agreement shall be construed and governed by the laws of the State of New York.  This Agreement shall be enforceable only in the Court where the Lawsuit was filed.

14.    This Agreement may be executed in multiple counterparts, with each counterpart being an original document and all counterparts, when fully signed and taken together, constituting the Agreement of these parties, subject to the terms set forth herein.

15.     The parties further agree that this Agreement may be signed by facsimile or electronic (pdf) signatures, each of which shall be taken as an original for purposes of concluding this Agreement.

16.     In the event of any dispute or litigation arising out of or related to this Agreement, the prevailing party or parties shall be entitled to recover their costs and reasonable attorneys' fees.

IN WITNESS WHEREOF, each party hereto has read, understood and agrees to be bound by and hereby executes and delivers this Agreement as of the date and year first above written.

ZAKENI LIMITED                                  SPYR, INC.

By: _____        By: _____
        Sheldon Salcman, President                        James R. Thompson, CEO & President

15.    The parties further agree that this Agreement may be signed by facsimile or electronic (pdf) signatures, each of which shall be taken as an original for purposes of concluding this Agreement.

16.    In the event of any dispute or litigation arising out of or related to this Agreement, the prevailing party or parties shall be entitled to recover their costs and reasonable attorneys' fees.

IN WITNESS WHEREOF, each party hereto has read, understood and agrees to be bound by and hereby executes and delivers this Agreement as of the date and year first above written.

ZAKENI LIMITED                                      SPYR, INC.

By: _____          By: _____
    Sheldon Salcman, President                    James R. Thompson, CEO & President

EXHIBIT A

FORM OF WARRANT

[see attached]

**NEITHER THESE SECURITIES, NOR THE SECURITIES ISSUABLE UPON THE EXERCISE OF THESE SECURITIES, HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED ("SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS AS EVIDENCED BY A LEGAL OPINION OF COUNSEL TO THE TRANSFEROR TO SUCH EFFECT, THE SUBSTANCE OF WHICH SHALL BE REASONABLY ACCEPTABLE TO THE COMPANY (AS DEFINED BELOW).**

**SPYR, INC.**

**COMMON STOCK WARRANT**
**SERIES 2018S**
**CLASS ___** [1]

Warrant Certificate No.: 2018S-[NUMBER[2]]
Original Issue Date: [DATE[3]]

This Common Stock Warrant  ("**Warrant**") certifies that, for value received, Zakeni Limited, or its assigns ("**Holder**") is entitled to purchase from SPYR, Inc., a Nevada corporation ("**Company**" or "**Issuer**"), up to a total of One Million (1,000,000)[4] shares of Common Stock (as defined below) (each such share of Common Stock, a "**Warrant Share**" and all such shares of Common Stock, the "**Warrant Shares**"), at any time and from time to time after _____, 2018[5] (the "**Earliest Exercise Date**") through and including the Expiration Date, all on the terms and subject to the conditions set forth below:

1.    <u>Definitions</u>.    As used in this Warrant, the following terms shall have the definitions set forth in this Section 1.  Other capitalized terms used and not otherwise defined shall have the meanings set forth in that certain Settlement Agreement and Mutual Release, dated June 22, 2018 (the "Settlement Agreement"), between the Company and the Holder.

---

[1] Insert "A", "B" or "C"

[2] Insert unique number, with class identifier (e.g. A-1) for each Warrant being issued ["ID Number"]

[3] Insert date of Court Order

[4] Use this number for Class A and C Warrants. For Class B Warrant, change to One Million Five Hundred Thousand (1,500,000).

[5] Insert date which is six months after Original Issue Date

"**Affiliate**" means any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with a Person, as such terms are used in and construed under Rule 144.

"**Board**" means the board of directors of the Company.

"**Business Day**" means any day except a Saturday, Sunday and any day that is a federal legal holiday or a day on which banking institutions in the State of New York are authorized or required by law or other governmental action to close.

"**Common Stock**" means the common stock of the Company, $0.0001 par value per share, and any securities into which such common stock may hereafter be reclassified or for which it may be exchanged as a class.

"**Convertible Securities**" means Company securities which by their terms are convertible into shares of the Company's Common Stock at a specified conversion price or pursuant to a formula to determine such conversion price.  Convertible Securities which were issued prior to and were outstanding as of the Original Issue Date are "**Existing Convertible Securities**," and Convertible Securities which are issued after the Original Issue Date are "**New Convertible Securities**."

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Excluded Issuances**" means any issuance or sale by the Company after the Original Issue Date of: (a) shares of Common Stock issued upon the exercise of this Warrant or any other Warrant in this Series; (b) shares of Common Stock (as such number of shares is equitably adjusted for subsequent stock splits, stock combinations, stock dividends and recapitalizations) issued directly or upon the exercise of options or warrants to directors, officers, employees, or consultants of the Company in connection with their service as directors of the Company, their employment by the Company or their retention as consultants by the Company, in each case authorized by the Board and issued pursuant to the Company's Employee Incentive Plan, or other like plan or employment agreements, including all such shares of Common Stock and options or warrants outstanding prior to the Original Issue Date; or (c) shares of Common Stock issued upon the conversion or exercise of options or warrants (other than the options and warrants covered by clause (b) above) or Existing Convertible Securities; provided that such securities are not amended after the date hereof to increase the number of shares of Common Stock issuable thereunder or to lower the exercise or conversion price thereof or to extend the term, except as may be provided by the terms thereof as currently in effect; (d) shares of Common Stock, options, warrants, or New Convertible Securities issued (i) to persons in connection with a joint venture, acquisition, merger in which the Company is the surviving entity, strategic alliance or other commercial relationship with such person (including persons that are customers, suppliers and strategic partners of the Company) relating to the operation of the Company's business and not for the primary purpose of raising equity capital, (ii) in connection with a transaction in which the Company, directly or indirectly, acquires another business or its tangible or intangible assets, or (iii) to lenders as equity kickers in connection with debt financings of the Company, in each case where such transactions have been approved by the Board; (e) shares of Common

Stock in an offering for cash for the account of the Company that is underwritten on a firm commitment basis and is registered with the Securities and Exchange Commission under the Securities Act of 1933, as amended; or (f) shares of Common Stock, options, warrants or New Convertible Securities issued to the lessor or vendor in any office lease or equipment lease or similar equipment financing transaction in which the Company obtains the use of such office space or equipment for its business.

"**Exercise Date**" means, for any given exercise of this Warrant, the date, which date shall be during the Exercise Period, on which the conditions to such exercise as set forth herein shall have been satisfied, including, without limitation, the receipt by the Company by 5:00 PM Denver, Colorado Time of the Exercise Notice, the Warrant (if fully exercised) and the aggregate Exercise Price (if the exercise is not a cashless exercise).

"**Exercise Notice**" means a written notice from the Holder to the Company substantially in the form attached hereto as **Exhibit A,** specifying, among other things, the number of Warrant Shares being exercised and the manner of such exercise.

"**Exercise Period**" means the period commencing on the Earliest Exercise Date and expiring at 5:00 p.m., Denver, Colorado Time on the Expiration Date

"**Exercise Price**" means \$____[6] in United States Dollars, subject to adjustment in accordance with Section 8 of this Warrant Agreement.

"**Expiration Date**" means the earlier of _____, __2018[7] (the "**Scheduled Expiration Date**") or, if an Exercise Demand (as defined below) is duly given by the Company and not canceled, the Early Expiration Date.

"**Fair Market Value**" means on any particular date (a) the closing sales price per share of the Common Stock on such date on any registered national stock exchange on which the Common Stock is then listed, or if there is no such closing sales price on such date, then the closing sales price on such exchange or quotation system on the date nearest preceding such date, or (b) if the Common Stock is not then listed on a registered national stock exchange, the closing sales price for a share of Common Stock in the over-the-counter market, as reported by the Trading Market (or similar organization or agency succeeding to its functions of reporting prices) at the close of business on such date, or (c) if the Common Stock is not then reported by the Trading Market (or similar organization or agency succeeding to its functions of reporting prices), then the fair market value of a share of Common Stock as determined by an Independent Appraiser selected in good faith by the Holder; provided, however, that all determinations of the Fair Market Value shall be appropriately adjusted for any stock dividends, stock splits or other similar transactions during such period. The determination of fair market value by an Independent Appraiser (i) shall be based upon the fair market value of the Issuer determined on a going concern basis as between a willing buyer and a willing seller and taking into account all

---

[6] For Class A - \$0.25; Class B - \$0.50; Class C -- \$0.75
[7] Insert date which the last calendar day of the month in which the 5th anniversary of the Original Issue Date occurs.

relevant factors determinative of value, and (ii) shall be final and binding on all parties. In determining the fair market value of any shares of Common Stock, no consideration shall be given to any restrictions on transfer of the Common Stock imposed by agreement or by federal or state securities laws, or to the existence or absence of, or any limitations on, voting rights.

"**Fundamental Transaction**" means any of the following: (i) the Company effects any merger or consolidation of the Company with or into another Person as a result of which transaction, the stockholders of the Company as of a time immediately prior to such transaction no longer hold at least 50% of the voting securities of the surviving entity and the Company is not the surviving entity; (ii) the Company effects any sale of all or substantially all of its assets in one or a series of related transactions; (iii) any tender offer or exchange offer (whether by the Company or another Person), as defined under the federal securities laws, is completed pursuant to which holders of Common Stock are permitted to tender or exchange their shares for other securities, cash or property; or (iv) the Company effects any reclassification of the Common Stock or any compulsory share exchange pursuant to which the Common Stock is converted into or exchanged for other securities, cash or property.  For avoidance of doubt, in no event shall any Excluded Issuance be considered a Fundamental Transaction.

"**New York Courts**" means the state and federal courts sitting in the State of New York, City of New York, Borough of Manhattan.

"**Person**" means any individual, sole proprietorship, partnership, limited liability company, corporation, joint venture, trust, incorporated organization or government or department or agency thereof.

"**Original Issue Date**" means the Original Issue Date first set forth on the first page of this Warrant Agreement.

"**Person**" means an individual or corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government (or an agency or subdivision thereof) or other entity of any kind.

"**Register**", "**registered**", **and** "**registration**" shall refer to a registration effected by preparing and (a) filing a Registration Statement in compliance with the Securities Act and applicable rules and regulations thereunder, and the declaration of or automatic effectiveness of such Registration Statement or (b) filing a Prospectus and/or prospectus supplement in respect of an appropriate effective Registration Statement on an appropriate form.

"**Rule 144**" means Rule 144 promulgated by the Securities and Exchange Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Securities and Exchange Commission having substantially the same effect as such Rule.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Series**" means the Series 2018S Warrants, which, as of the Original Issue Date, consist of one or more warrants in each of three (3) classes (each, a "**Class**"), which (i) provide for an aggregate of 3,500,000 Warrant Shares and (ii) have initial Exercise Prices of Class A - $0.25, Class B - $0.50, and Class C - $0.75, respectively.  Such term applies to any adjustments in the Warrant Shares or Exercise Prices contemplated herein and to any replacement Warrant or Warrant issued to a transferee as contemplated herein.  The Issuer agrees that, except for such adjustments and replacement certificates, no additional Warrants in this Series will be issued to any third Party without the express prior written consent of the Holder in each instance, which consent is in the sole discretion of the Holder and may be withheld or delayed for any reason or for no reason whatsoever.  This Warrant is issued as all or part of one of such Classes.

"**Trading Day**" means a day on which the Common Stock is traded or quoted on a Trading Market; provided, that if the Common Stock is not traded or quoted on a Trading Market, then "Trading Day" shall mean a Business Day.

"**Trading Market**" means whichever of the New York Stock Exchange, the NYSE MKT, The NASDAQ Global Select Market, The NASDAQ Global Market, The NASDAQ Capital Market, the OTC Markets or any market owned or operated by OTC Markets Group Inc. (or any similar organization or agency succeeding to its functions of reporting prices) on which the Common Stock is listed or quoted for trading on the date in question.

2.     [Reserved]

3.     <u>Exercise of Warrant</u>.

(a) <u>Exercise Procedure</u>.  This Warrant may be exercised from time to time on any Business Day during the Exercise Period, for all or any part of the unexercised Warrant Shares, upon:

(i)     delivery to the Company of a duly completed and executed Exercise Notice, (which delivery may be made by electronic means);

(ii)     if such exercise represents the final exercise hereof, surrender of this Warrant to the Company at its then principal executive offices (or an indemnification undertaking with respect to this Warrant in the case of its loss, theft or destruction); and

(iii)     payment (if the exercise is not a cashless exercise contemplated by the other provisions of this Section 3) to the Company of the Aggregate Exercise Price in accordance with Section 3(b)(i).

(b) <u>Payment of the Aggregate Exercise Price</u>.  Payment of the Aggregate Exercise Price (Exercise Price multiplied by the number of Warrant Shares being exercised) shall be made, at the option of the Holder, by the following methods:

(i) by delivery to the Company of a certified or official bank check payable to the order of the Company or by wire transfer of immediately available funds to an account

designated in writing by the Company, in the amount of such Aggregate Exercise Price; or,

(ii) in the event the Warrant Shares are not registered in an effective registration statement under the Securities Act on the Exercise Date, by instructing the Company to issue Warrant Shares then issuable upon exercise of all or any part of this Warrant on a net basis such that, without payment of any cash consideration or other immediately available funds, the Holder shall be deemed to have exercised this Warrant for the number of shares being exercised in exchange for the issuance of the number of Warrant Shares as is computed using the following formula:

$$X = [Y(A - B)] \div A$$

Where:

| | | |
|---|---|---|
| X = | the number of Warrant Shares to be issued to the Holder. | |
| Y = | the total number of Warrant Shares for which the Holder has elected to exercise this Warrant pursuant to Section 3(a). | |
| A = | the Fair Market Value of one Warrant Share as of the applicable Exercise Date. | |
| B = | the Exercise Price in effect under this Warrant as of the applicable Exercise Date. | |

(c) <u>No Limitation on Sales of Warrant Shares</u>.  Any other provision of this Warrant or any other agreement between the Company and the Holder to the contrary notwithstanding, the Holder's sale of Warrant Shares (i) shall not be subject to any provision limiting the sale of such Warrant Shares by the Holder on any given day or over any given period of time and (ii) shall not count towards any other gating or other limitation which may otherwise be applicable to sales of any other shares held or acquired by the Holder.

(d) <u>Delivery of Stock Certificates</u>.

(i)     Upon receipt by the Company of the Exercise Notice, and, if the exercise is not a cashless exercise, payment of the Aggregate Exercise Price (in accordance with Section 3(a) hereof), the Holder hereof shall be deemed for all purposes to be the holder of the Warrant Shares so purchased as of the date of such exercise, and the Company shall execute (or cause to be executed) and deliver (or cause to be delivered) as promptly as practicable, and in any event within five (5) Trading Days thereafter (such fifth Trading Day, a "Delivery Date") (i) to the Holder a certificate or certificates representing the Warrant Shares issuable upon such exercise,) or, (ii) subject to the provisions of the following sentence, if requested by the Holder, issue and deliver such shares to the Depository Trust Company ("DTC") account on the Holder's behalf via the Deposit Withdrawal Agent Commission System ("DWAC").  Notwithstanding anything in the foregoing sentence to the contrary, the Issuer or its transfer agent shall only be obligated to issue and deliver the shares to DTC on a holder's behalf via DWAC if (a) such shares may be issued without restrictive legends and (b) the Issuer and the transfer agent are participating in DTC through the DWAC system.  If all of the conditions set forth in clauses (a) and (b) above are not satisfied, the transfer agent shall deliver physical certificates representing the Warrant

Shares to the Holder. The stock certificate or certificates (or DWAC shares) so delivered shall be, to the extent possible, in such denomination or denominations as the exercising Holder shall reasonably request in the Exercise Notice and shall be registered in the name of the Holder or, subject to compliance with Section 5 below, such other Person's name as shall be designated in the Exercise Notice. This Warrant shall be deemed to have been exercised and such certificate or certificates of Warrant Shares shall be deemed to have been issued, and the Holder or any other Person so designated to be named therein shall be deemed to have become a holder of record of such Warrant Shares for all purposes, as of the Exercise Date.

(ii)     The Issuer understands that a delay in the delivery of the Warrant Shares upon exercise of this Warrant beyond the Delivery Date could result in economic loss to the Holder. As such, if the Issuer fails for any reason to deliver to the Holder any Warrant Shares issuable upon the exercise of this Warrant via DWAC or physical certificate, as the case may be, by the relevant Delivery Date, the Issuer shall pay to the Holder, in cash, as liquidated damages and not as a penalty, for each $1,000 of Warrant Shares subject to such exercise (based on the Fair Market Value of the Common Stock on the Exercise Date), $10 per Trading Day (increasing to $20 per Trading Day on the fifth Trading Day after such liquidated damages begin to accrue) for each Trading Day after such Delivery Date until such certificates are delivered.

(iii)     In addition to, and not in lieu of, any other rights available to the Holder, if at any time that there shall be a Trading Market for the Common Stock, the Issuer fails to cause its transfer agent to transmit to the Holder a certificate or certificates representing the Warrant Shares pursuant to an exercise on or before the relevant Delivery Date, and if after such date the Holder is required by its broker to purchase (in an open market transaction or otherwise) shares of Common Stock to deliver in satisfaction of a sale by the Holder of the Warrant Shares which the Holder anticipated receiving upon such exercise (a "Buy-In"), then the Issuer shall (1) pay in cash to the Holder the amount by which (x) the Holder's total purchase price (including brokerage commissions, if any) for the shares of Common Stock so purchased exceeds (y) the amount obtained by multiplying (A) the number of Warrant Shares that the Issuer was required to deliver to the Holder in connection with the exercise at issue times (B) the price at which the sell order giving rise to such purchase obligation was executed, and (2) at the option of the Holder, either reinstate the portion of the Warrant and equivalent number of Warrant Shares for which such exercise was not honored or deliver to the Holder the number of shares of Common Stock that would have been issued had the Issuer timely complied with its exercise and delivery obligations hereunder. For example, if the Holder purchases Common Stock having a total purchase price of $11,000 to cover a Buy-In with respect to an attempted exercise of shares of Common Stock with an aggregate sale price giving rise to such purchase obligation of $10,000, under clause (1) of the immediately preceding sentence the Issuer shall be required to pay the Holder $1,000. The Holder shall provide the Issuer written notice indicating the amounts payable to the Holder in respect of the Buy-In, together with applicable confirmations and other evidence reasonably requested by the Issuer.

(e) Charges, Taxes and Expenses. Issuance and delivery of Warrant Shares upon exercise of any Warrants shall be made without charge to the Holder for any issue or transfer tax, transfer agent fee, Rule 144 legal fees or other incidental tax or expense solely in respect of the issuance of such certificates, all of which taxes and expenses shall be paid by the Company;

provided, however, that the Company shall not be required to pay any Holder Taxes (as defined below).  The term **"Holder Tax"** means a tax which may be payable in respect of any transfer involved in the registration of any certificates for Warrant Shares or Warrants in a name other than that of the Holder or any tax based on the net taxable income of the Holder as a result of any transaction relating to the Warrants or the Warrant Shares.

(f) <u>Valid Issuance of Warrant and Warrant Shares; Payment of Taxes</u>.  With respect to the exercise of this Warrant, the Company hereby represents, covenants and agrees:

(i) This Warrant is, and any Warrant issued in substitution for or replacement of this Warrant shall be, upon issuance, duly authorized and validly issued.

(ii) All Warrant Shares issuable upon the exercise of this Warrant pursuant to the terms hereof shall be, upon issuance, and the Company shall take all such actions as may be necessary or appropriate in order that such Warrant Shares are, validly issued, fully paid and non-assessable, issued without violation of any preemptive or similar rights of any stockholder of the Company and free and clear of all taxes, liens and charges.

(iii) The Company shall take all such actions as may be necessary to ensure that all such Warrant Shares are issued without violation by the Company of any applicable law or governmental regulation or any requirements of any domestic securities exchange upon which shares of Common Stock or other securities constituting Warrant Shares may be listed at the time of such exercise (except for official notice of issuance which shall be immediately delivered by the Company upon each such issuance).

(iv) The Company shall use its best efforts to cause the Warrant Shares, immediately upon such exercise, to be listed on any domestic securities exchange upon which shares of Common Stock or other securities constituting Warrant Shares are listed at the time of such exercise.

(v) The Company shall pay all expenses in connection with, and all taxes (other than Holder Taxes) and other governmental charges that may be imposed with respect to, the issuance or delivery of Warrant Shares upon exercise of this Warrant; *provided*, that the Company shall not be required to pay any tax or governmental charge that may be imposed with respect to any applicable withholding or the issuance or delivery of the Warrant Shares to any Person other than the Holder, and no such issuance or delivery shall be made unless and until the Person requesting such issuance has paid to the Company the amount of any such tax, or has established to the satisfaction of the Company that such tax has been paid.

(g) <u>Compliance with Securities Laws</u>.

This Warrant and, except with respect to certificates issued in connection with a cashless exercise of this Warrant, all certificates representing Warrant Shares issued upon exercise hereof shall be stamped or imprinted with a legend in substantially the following form:

THIS WARRANT AND THE SHARES OF COMMON STOCK ISSUABLE UPON EXERCISE HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE SECURITIES ACT AND UNDER APPLICABLE STATE SECURITIES LAWS OR THE ISSUER SHALL HAVE RECEIVED AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT REGISTRATION OF SUCH SECURITIES UNDER THE SECURITIES ACT AND UNDER THE PROVISIONS OF APPLICABLE STATE SECURITIES LAWS IS NOT REQUIRED.

The Company agrees to reissue this Warrant or certificates representing any of the Warrant Shares, without the legend set forth above if at such time, prior to making any transfer of any such securities, the Holder shall give written notice to the Issuer describing the manner and terms of such transfer. Such proposed transfer will not be effected until: (i) the Issuer has received an opinion of its counsel reasonably satisfactory to the Issuer, to the effect that the registration of such securities under the Securities Act is not required in connection with such proposed transfer; (ii) a registration statement under the Securities Act covering such proposed disposition has been filed by the Issuer with the SEC and has become effective under the Securities Act; (iii) the Issuer has received evidence reasonably satisfactory to the Issuer that such registration and qualification under the Securities Act and state securities laws are not required (in which event, the Issuer shall provide its transfer agent with any required legal opinions); (iv) the Holder provides the Issuer with reasonable assurances that such security can be sold pursuant to Rule 144 under the Securities Act (in which event, the Issuer shall, at the Issuer's expense, provide its transfer agent with any required legal opinions) or (v) in the event of a cashless exercise . For purposes of Rule 144 promulgated under the Securities Act, it is intended, understood and acknowledged that the Warrant Securities issued in a cashless exercise transaction shall be deemed to have been acquired by the Holder, and the holding period for the Warrant Shares shall be deemed to have commenced, on the date these Warrants were originally issued.

(h) <u>Holder Representations.</u>  In connection with the issuance of this Warrant, the Holder specifically represents, as of the date hereof, to the Company by acceptance of this Warrant as follows. The Holder is acquiring this Warrant and the Warrant Shares to be issued upon exercise hereof for investment for its own account and not with a view towards, or for resale in connection with, the public sale or distribution of this Warrant or the Warrant Shares, except pursuant to sales registered or exempted under the Securities Act. The Holder understands and acknowledges that this Warrant and the Warrant Shares to be issued upon exercise hereof are "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that, under such laws and applicable regulations, such securities may be resold without registration under the Securities Act only in certain limited circumstances. In addition, the Holder represents that it is familiar with Rule 144 under the Securities Act, as presently in effect, and understands the resale limitations imposed thereby and by the Securities Act. The Holder acknowledges that it can bear the economic and financial risk of its investment for an indefinite period and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Warrant and the Warrant Shares. The Holder has had an opportunity to ask questions and receive answers from the Company regarding the terms and

conditions of the offering of the Warrant and the business, properties, prospects and financial condition of the Company.

(i) <u>Registration; Listing</u>.

(i)  Reference is made to the Registration Rights Agreement, the terms of which are incorporated herein by reference.

(ii)  If any shares of Common Stock required to be reserved for issuance upon exercise of this Warrant or as otherwise provided hereunder require registration or qualification with any Governmental Authority under any federal or state law before such shares may be so issued, the Issuer will in good faith use its best efforts as expeditiously as possible at its expense to cause such shares to be duly registered or qualified. If, and for so long as, the Common Stock of the Issuer is listed on any securities exchange or market, the Issuer will, at its expense, list thereon, maintain and increase when necessary such listing, of, all Warrant Shares from time to time issued upon exercise of this Warrant or as otherwise provided hereunder, and, to the extent permissible under the applicable securities exchange rules, all unissued Warrant Shares which are at any time issuable hereunder. The Issuer will also so list on each securities exchange or market, and will maintain such listing of, any other securities which the Holder of this Warrant shall be entitled to receive upon the exercise of this Warrant if at the time any securities of the same class shall be listed on such securities exchange or market by the Issuer.

(j) <u>Reservation of Shares</u>.  During the Exercise Period, the Company shall at all times reserve and keep available out of its authorized but unissued Common Stock or other securities constituting Warrant Shares, solely for the purpose of issuance upon the exercise of this Warrant, the maximum number of Warrant Shares issuable upon the exercise of this Warrant, and the par value per Warrant Share shall at all times be less than or equal to the applicable Exercise Price. The Company shall not increase the par value of any Warrant Shares receivable upon the exercise of this Warrant above the Exercise Price then in effect and shall take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable shares of Common Stock upon the exercise of this Warrant.

(k) <u>Exercise and Duration of Warrants</u>.  These Warrants shall be exercisable by the registered Holder at any time and from time to time during the Exercise Period.  At 5:00 p.m., Denver, Colorado Time, on the Expiration Date, the portion of these Warrants not exercised prior thereto shall be and become void and of no value.

(l) <u>Company's Right to Demand Exercise or Cancellation</u>.

(i)  The Company's right to issue an Exercise Demand (as defined below), subject to the following provisions, shall apply only on or after the Earliest Exercise Date.

(ii)  In the event that, during each of twenty (20) consecutive Trading Days (the last of such consecutive Trading Days, the **"Trigger Date"**) each of all of the following conditions has been satisfied,

(x) the Company's Common Stock trades on the Trading Market at a closing price for each such Trading Day that equals or exceeds 150% the Exercise Price then in effect for this Warrant;

(y) the trading volume on the Trading Market for each such Trading Day is at least 75,000 shares (such number to be adjusted for any stock splits and similar capital adjustments effected after the Original Issue Date); and

(z) the Warrant Shares are subject to an effective Registration Statement for each such Trading Day; provided, however, that, as of the date of the Holder's receipt of the Exercise Demand (as defined below), the last day of the effectiveness of such Registration Statement is at least 90 days after the date of the Holder's receipt of the Exercise Demand,

the Company shall have the right to provide written notice (the "**Exercise Demand**") to Holder, which Exercise Notice may be given no later than 5 PM, New York Time on the date which is the fifth (5th) Trading Day after the Trigger Date as of which all such conditions have been satisfied, accelerating the Expiration Date to a specified date (the **"Early Expiration Date"**), which date shall be no earlier than the date which is fifteen (15) Trading Days after the date of the Holder's receipt of the Exercise Demand; provided, however, if the Registration Statement covering the Warrant Shares is not effective at any time from the Trigger Date through and including the end of the Early Expiration Date, the Exercise Demand shall be deemed automatically withdrawn and canceled and the Expiration Date shall remain the Scheduled Expiration Date, as in effect prior to and without regard to the Exercise Demand.

(iii)     After receiving a duly issued Exercise Demand, Holder may exercise this Warrant in accordance with its terms at any time up to end of the Early Expiration Date, but any outstanding and unexercised portion of this Warrant at the end of the Early Expiration Date shall automatically lapse and be deemed cancelled, forfeited, waived, voided and of no further force or effect.

4.     Registration of Warrants.     The Company shall register these Warrants upon records to be maintained by the Company for that purpose (**"Warrant Register"**), in the name of the record Holder from time to time.  The Company may deem and treat the registered Holder of these Warrants as the absolute owner hereof for the purpose of any exercise hereof or any distribution to the Holder, and for all other purposes, absent actual notice to the contrary.

5.     Registration of Transfers.     On the terms and subject to the conditions set forth in this Warrant Agreement, the Company shall register the transfer of any portion of these Warrants in the Warrant Register, upon surrender of these Warrants, with the Form of Assignment attached hereto duly completed and signed, to the Company at its address specified in this Warrant Agreement.  Upon any such registration or transfer, a new certificate representing the right to purchase Warrant Shares in substantially the form of this Warrant Agreement (a **"New Warrant Certificate"**), evidencing the portion of these Warrants so transferred shall be issued to the transferee and a New Warrant Certificate evidencing the remaining portion of these Warrants not so transferred, if any, shall be issued to the transferring Holder.  The acceptance of

the New Warrant Certificate by the transferee thereof shall be deemed the acceptance by such transferee of all of the rights and obligations of a holder of a Warrant.

6.    <u>Replacement of Warrant; Partial Exercise</u>.

(i)    If this Warrant Agreement is mutilated, lost, stolen or destroyed, the Company shall issue or cause to be issued in exchange and substitution for and upon cancellation hereof, or in lieu of and substitution for this Warrant Agreement, a New Warrant, but only upon receipt of evidence reasonably satisfactory to the Company of such loss, theft or destruction and customary and reasonable indemnity (which shall not include a surety bond), if requested. Applicants for a New Warrant under such circumstances shall also comply with such other reasonable regulations and procedures and pay such other reasonable third-party costs as the Company may prescribe. If a New Warrant Certificate is requested as a result of a mutilation of this Warrant Agreement, then the Holder shall deliver such mutilated Warrant Agreement to the Company as a condition precedent to the Company's obligation to issue the New Warrant.

(ii)    With respect to partial exercises of this Warrant, the Issuer shall keep written records for the Holder of the number of Warrant Shares exercised as of each date of exercise.

(iii)    The Holder shall deliver this original Warrant, or an indemnification undertaking with respect to such Warrant in the case of its loss, theft or destruction, at such time that this Warrant is fully exercised.

7.    <u>Holder Not Deemed a Stockholder; Limitations on Liability</u>. Except as otherwise specifically provided herein, prior to the exercise of this Warrant for the issuance to the Holder of the Warrant Shares, which the Holder is then entitled to receive upon the due exercise of this Warrant, the Holder shall not be entitled to vote or receive dividends or be deemed the holder of shares of capital stock of the Company for any purpose, nor shall anything contained in this Warrant be construed to confer upon the Holder, as such, any of the rights of a stockholder of the Company or any right to vote, give or withhold consent to any corporate action (whether any reorganization, issue of stock, reclassification of stock, consolidation, merger, conveyance or otherwise), receive notice of meetings, receive dividends or subscription rights, or otherwise. In addition, nothing contained in this Warrant shall be construed as imposing any liabilities on the Holder to purchase any securities (upon exercise of this Warrant or otherwise) or as a stockholder of the Company, whether such liabilities are asserted by the Company or by creditors of the Company.

8.    <u>Certain Adjustments</u>. The Exercise Price and number of Warrant Shares issuable upon exercise of this Warrant are subject to adjustment from time to time, excepting Excluded Issuances, as set forth in this Section 8.

(a) <u>Recapitalization, Reorganization, Reclassification, Consolidation, Merger or Sale</u>.

(i)    In case the Issuer after the Original Issue Date shall do a Fundamental Transaction (the occurrence of any Fundamental Transaction, a **"Triggering Event"**), proper provision shall be made to the Exercise Price and the number of shares of Warrant Shares that may be purchased upon exercise of this Warrant so that, upon the basis and the terms and in the

manner provided in this Warrant, the Holder of this Warrant shall be entitled upon the exercise hereof at any time after the consummation of such Triggering Event, to the extent this Warrant is not exercised prior to such Triggering Event, to receive at the Exercise Price as adjusted to take into account the consummation of such Triggering Event, in lieu of the Common Stock issuable upon such exercise of this Warrant prior to such Triggering Event, the securities, cash and property to which the Holder would have been entitled upon the consummation of such Triggering Event if the Holder had exercised the rights represented by this Warrant immediately prior thereto (including the right of a stockholder to elect the type of consideration it will receive upon a Triggering Event), subject to adjustments (subsequent to such corporate action) as nearly equivalent as possible to the adjustments provided for elsewhere in this Section 8.  Upon the Holder's request, the continuing or surviving corporation as a result of such Triggering Event shall issue to the Holder a new warrant of like tenor evidencing the right to purchase the adjusted amount of Warrant Shares, cash or property and the adjusted Exercise Price pursuant to the terms and provisions of this Section).

(ii)      In the event that the Holder has elected not to exercise this Warrant prior to the consummation of a Triggering Event, the surviving entity and/or each Person (other than the Issuer) which may be required to deliver any securities, cash or property upon the exercise of this Warrant as provided herein shall assume, by written instrument delivered to, and reasonably satisfactory to, the Holder of this Warrant, (A) the obligations of the Issuer under this Warrant (and if the Issuer shall survive the consummation of such Triggering Event, such assumption shall be in addition to, and shall not release the Issuer from, any continuing obligations of the Issuer under this Warrant) and (B) the obligation to deliver to the Holder such securities, cash or property as, in accordance with the foregoing provisions of this subsection (a), the Holder shall be entitled to receive, and the surviving entity and/or each such Person shall have similarly delivered to the Holder an opinion of counsel for the surviving entity and/or each such Person, which counsel shall be reasonably satisfactory to the Holder, or in the alternative, a written acknowledgement executed by the President or Chief Financial Officer of the Issuer, stating that this Warrant shall thereafter continue in full force and effect and the terms hereof (including, without limitation, all of the provisions of this subsection (a)) shall be applicable to the securities, cash or property which the surviving entity and/or each such Person may be required to deliver upon any exercise of this Warrant or the exercise of any rights pursuant hereto.

(b) Stock Dividends.  If at any time the Issuer shall make or issue or set a record date for the holders of the Common Stock for the purpose of entitling them to receive a dividend payable in, or other distribution of, shares of Common Stock, the Company shall reserve for Holder the appropriate number of shares in the event the Holder exercises the Warrants in the future.

(c) Subdivisions and Combinations.  If at any time the Issuer shall: (i) make or issue or set a record date for the holders of the Common Stock for the purpose of entitling them to receive a dividend payable in, or other distribution of, shares of Common Stock, (ii) subdivide its outstanding shares of Common Stock into a larger number of shares of Common Stock, or (ii) combine its outstanding shares of Common Stock into a smaller number of shares of Common Stock, then (1) the number of shares of Common Stock for which this Warrant is exercisable immediately after the occurrence of any such event shall be adjusted to equal the number of shares of Common Stock which a record holder of the same number of shares of Common Stock

for which this Warrant is exercisable immediately prior to the occurrence of such event would own or be entitled to receive after the happening of such event, and (2) the Exercise Price then in effect shall be adjusted to equal (A) the Exercise Price then in effect multiplied by the number of shares of Common Stock for which this Warrant is exercisable immediately prior to the adjustment divided by (B) the number of shares of Common Stock for which this Warrant is exercisable immediately after such adjustment.

(d) Certain Other Distributions.  If at any time the Issuer shall make or issue or set a record date for the holders of the Common Stock for the purpose of entitling them to receive any dividend or other distribution of cash, property, evidences of indebtedness or securities of any nature whatsoever (other than Common Stock), then (1) the number of shares of Common Stock for which this Warrant is exercisable shall be adjusted to equal the product of the number of shares of Common Stock for which this Warrant is exercisable immediately prior to such adjustment multiplied by a fraction (A) the numerator of which shall be the Fair Market Value of Common Stock at the date of taking such record and (B) the denominator of which shall be such Fair Market Value minus the amount allocable to one share of Common Stock of any such cash so distributable and of the fair value (as determined in good faith by the Board and supported by an opinion from an investment banking firm mutually agreed upon by the Issuer and the Holder) of any and all such evidences of indebtedness, securities or property so distributable, and (2) the Exercise Price then in effect shall be adjusted to equal the Exercise Price then in effect multiplied by a fraction (A) the numerator of which shall be the number of shares of Common Stock for which this Warrant is exercisable immediately prior to the adjustment and (B) the denominator of which shall be the number of shares of Common Stock for which this Warrant is exercisable immediately after such adjustment. A reclassification of the Common Stock (other than a change in par value, or from par value to no par value or from no par value to par value) into shares of Common Stock and shares of any other class of stock shall be deemed a distribution by the Issuer to the holders of its Common Stock of such shares of such other class of stock within the meaning of this Section 4(e) and, if the outstanding shares of Common Stock shall be changed into a larger or smaller number of shares of Common Stock as a part of such reclassification, such change shall be deemed a subdivision or combination, as the case may be, of the outstanding shares of Common Stock within the meaning of Section 4(b).

(e) Number of Warrant Shares.  Simultaneously with any adjustment to the Exercise Price pursuant to this Section 8, the number of Warrant Shares that may be purchased upon exercise of these Warrants shall be increased or decreased proportionately, so that after such adjustment the aggregate Exercise Price payable hereunder for the adjusted number of Warrant Shares shall be the same as the aggregate Exercise Price in effect immediately prior to such adjustment.

(f) Calculations.  All calculations under this Section 8 shall be made to the nearest cent or the nearest $1/100^{th}$ of a share, as applicable.  The number of shares of Common Stock outstanding at any given time shall not include shares owned or held by or for the account of the Company, and the disposition of any such shares shall be considered an issue or sale of Common Stock.

(g) Notice of Adjustments.  Upon the occurrence of each adjustment pursuant to this Section 8, the Company at its expense will promptly compute such adjustment in accordance

with the terms of this Warrant Agreement and prepare a certificate setting forth such adjustment, including a statement of the adjusted Exercise Price and adjusted number or type of Warrant Shares or other securities issuable upon exercise of these Warrants (as applicable). Upon written request, the Company will promptly deliver a copy of each such certificate to the Holder.

9.     Limitations on Exercise.

(a) Except as specified in Section 9(b), notwithstanding anything to the contrary contained herein, the number of Warrant Shares that may be acquired by the Holder upon any exercise of these Warrants (or otherwise in respect hereof) shall be limited to the extent necessary to insure that, following such exercise (or other issuance), the total number of shares of Common Stock then beneficially owned by such Holder and its Affiliates and any other Persons whose beneficial ownership of Common Stock would be aggregated with the Holder's for purposes of Section 13(d) of the Exchange Act, does not exceed 9.99% of the total number of issued and outstanding shares of Common Stock (including for such purpose the shares of Common Stock issuable upon such exercise).  For such purposes, beneficial ownership shall be determined in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder.  Notwithstanding anything to the contrary contained in this Warrant Agreement: (i) no term of this Section 9 may be waived by any party, nor may any term of this Section 9 be amended such that the threshold percentage of ownership as set forth above would be directly or indirectly increased; (ii) this restriction runs with these Warrants and may not be modified or waived by any subsequent Holder hereof; and (iii) any attempted waiver, modification or amendment of this Section 9 will be void ab initio.

(b) The provisions of this Section 9 shall not apply to any or more of the following periods: (i) while there is an outstanding tender offer for any or all of the shares of the Company's Common Stock, (ii) after the Holder has received a duly issued Exercise Demand for the Warrant Shares of this Warrant, but not after such Exercise Demand has been withdrawn or canceled pursuant to the provisions of Section 3(l)(ii), or (iii) at any time which is thirty (30) days or less before the Expiration Date.

10.     Notices.  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the [third] day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10).

If to the Company:

      Attention:  James R. Thompson, Chief Executive Officer
      4643 S. Ulster Street, Suite 1510
      Denver, Colorado 80237
      Facsimile: (303) 991-8001
      E-mail: jthompson@spyr.com

with a copy to:

      Mailander Law Office, Inc.
      835 5th Avenue, Ste. 312
      San Diego, CA 92101
      Facsimile: (619) 537-7193
      E-mail: tmailander@gmail.com
      Attention: Tad Mailander

If to the Holder:

      Zakeni Limited
      c/o Lodestar International Corp.
      Suite 100, Whitepark House
      White Park House
      St. Michael, Barbados BB11135
      Facsimile: : 246-429-2677
      Email: ssalcman@lodestar.bb
      Attention: Sheldon Salcman, President

with a copy to:

      Krieger & Prager LLP
      Attention: Samuel M. Krieger, Esq.
      39 Broadway, Suite 920
      New York, New York 10006
      E-mail: skrieger@kplawfirm.com
      Facsimile: (212) 363-2999

11.    <u>Miscellaneous</u>.

(a) This Warrant shall be binding on and inure to the benefit of the parties hereto and their respective successors and assigns.  Subject to the preceding sentence, nothing in this Warrant shall be construed to give to any Person other than the Company and the Holder any legal or equitable right, remedy or cause of action under this Warrant.  This Warrant may be amended only in writing signed by the Company and the Holder and their successors and assigns.  The foregoing sentence shall be subject to the restrictions on waivers and amendments set forth in Sections 9 and 11(l) of this Warrant.

(b) All questions concerning the construction, validity, enforcement, performance and interpretation of this Warrant Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof (other than Section 5-1401 of the General Obligations Law of the State of New York).  Each party agrees that all legal proceedings concerning the interpretations, enforcement and defense of this Warrant and the transactions herein contemplated (**"Proceedings"**) (whether brought against a party hereto or its respective Affiliates, employees or agents) shall be commenced exclusively in the New York Courts.  Each party hereto hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any Proceeding, any claim that it is not personally subject to the jurisdiction of any New York Court, or that such Proceeding has been commenced in an improper or inconvenient forum.  Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Warrant or the transactions contemplated hereby.  If either party shall commence a Proceeding to enforce any provisions of this Warrant, then the prevailing party in such Proceeding shall be reimbursed by the other party for its reasonable attorney's fees. **THE PARTIES HEREBY WAIVE ALL RIGHTS TO A TRIAL BY JURY**

(c) The failure of any of the parties hereto to at any time enforce any of the provisions of this Warrant shall not be deemed or construed to be a waiver of any such provision, nor to in any way effect the validity of this Warrant or any provision hereof or the right of any of the parties hereto to thereafter enforce each and every provision of this Warrant.  No waiver of any breach, non-compliance or non-fulfillment of any of the provisions of this Warrant shall be effective unless set forth in a written instrument executed by the party or parties against whom or which enforcement of such waiver is sought; and no waiver of any such breach, non-compliance or non-fulfillment shall be construed or deemed to be a waiver of any other or subsequent breach, non-compliance or non-fulfillment.

(d) The headings herein are for convenience only, do not constitute a part of this Warrant Agreement and shall not be deemed to limit or affect any of the provisions hereof.  Whenever the context requires, words used in the singular shall be construed to mean or include the plural and vice versa, and pronouns of any gender shall be deemed to include and designate the masculine, feminine or neuter gender.

(e) In case any one or more of the provisions of this Warrant shall be invalid or unenforceable in any respect, the validity and enforceability of the remaining terms and provisions of this Warrant shall not in any way be affected or impaired thereby and the parties will attempt in good faith to agree upon a valid and enforceable provision which shall be a commercially reasonable substitute therefor, and upon so agreeing, shall incorporate such substitute provision in this Warrant.

(f) Prior to exercise of a Warrant, the Holder hereof shall not, by reason of being a Holder, be entitled to any rights of a stockholder with respect to the Warrant Shares.

(g) Wherever possible, each provision of this Warrant shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Warrant shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Warrant.

(h) Entire Agreement.  This Warrant, together with the Settlement Agreement and the Registration Rights Agreement, constitutes the sole and entire agreement of the parties to this Warrant with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Warrant, the Settlement Agreement and the Registration Rights Agreement, the statements in the body of this Warrant shall control.

(i) Successor and Assigns.  This Warrant and the rights evidenced hereby shall be binding upon and shall inure to the benefit of the parties hereto and the successors of the Company and the successors and permitted assigns of the Holder. Such successors and/or permitted assigns of the Holder shall be deemed to be a Holder for all purposes hereunder.

(j) No Third-Party Beneficiaries.  This Warrant is for the sole benefit of the Company and the Holder and their respective successors and, in the case of the Holder, permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Warrant.

(k) Headings.  The headings in this Warrant are for reference only and shall not affect the interpretation of this Warrant.

[Balance of page intentionally left blank]

-18-

(l) <u>Amendment and Modification; Waiver</u>.  Except as otherwise provided herein, this Warrant may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.  No waiver by the Company or the Holder of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving.  No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Warrant shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**IN WITNESS WHEREOF**, the Company has caused this Warrant to be duly executed by its authorized officer this ____ day of _____, 2018, as of the Original Issue Date.

**SPYR, INC.**

By: _____

Name: James R. Thompson
Title: Chief Executive Officer

**EXERCISE NOTICE**

**SPYR, INC.**
**WARRANT DATED _____, 2018**
**SERIES 2018S**
**CLASS ___** [8]

Warrant Certificate No.: 2018S-[NUMBER[9]]


      The undersigned Holder hereby irrevocably elects to purchase Warrant Shares pursuant to the above referenced Warrant. Capitalized terms used herein and not otherwise defined have the meanings set forth in the Warrant.

(1)    The undersigned Holder hereby exercises its right to purchase _____Warrant Shares pursuant to the Warrant.

(2)    (PLEASE CHECK ONE METHOD OF PAYMENT)

    ☐ The Holder shall pay the sum of $_____ to the Company in accordance with the terms of the Warrant; or

    ☐ The Holder is acquiring the Warrant Share through a cashless exercise in accordance with the terms of the Warrant; the net number of Warrant Shares to be issued, as provided below, pursuant to this cashless exercise is _____ shares of Common Stock.

(3)    Pursuant to this Exercise Notice, the Company shall deliver to the holder Warrant Shares in accordance with the terms of the Warrant.

(4)    Please issue said Warrant Shares in the name of the undersigned or in such other name as is specified here: _____.

---

[8] Insert "A", "B" or "C"
[9] Insert ID Number from caption on first page

(5) By its delivery of this Exercise Notice, the undersigned represents and warrants to the Company that in giving effect to the exercise evidenced hereby the Holder will not beneficially own in excess of the number of shares of Common Stock (determined in accordance with Section 13(d) of the Securities Exchange Act of 1934) permitted to be owned under Section 9 of the Warrant.

Dated: _____     Name of Holder:

(Print)

Name:
Title:
Date:

(Signature must conform in all respects to name of holder as specified on the face of the Warrant.)

**WARRANT EXERCISE LOG**

**WARRANT DATED _____, 2018**
**SERIES 2018S**
**CLASS ___** [10]

Warrant Certificate No.: 2018S-[NUMBER[11]]

| Date | Number of Warrant Shares Available to be Exercised | Number of Warrant Shares Exercised | Number of Warrant Shares Remaining to be Exercised |
|------|---------|---------|---------|
| | | | |

---

[10] Insert "A", "B" or "C"
[11] Insert ID Number from caption on first page

**SPYR, INC.**
**WARRANT DATED _____, 2018**
**SERIES 2018S**
**CLASS ___**[12]

Warrant Certificate No.: 2018S-[NUMBER[13]]

**ASSIGNMENT FORM**

(To assign the foregoing warrant or warrants, execute
this form and supply required information.
Do not use this form to exercise the warrant.)

FOR VALUE RECEIVED, [_____] all of or [_____] Warrants and all rights evidenced thereby
are hereby assigned to

_____ whose address is

_____.

_____

Date: _____, _____

Holder's Signature: _____

Holder's Address: _____

_____

Signature Guaranteed: _____

NOTE: The signature to this Assignment Form must correspond with the name as it appears on
the face of the Warrant, without alteration or enlargement or any change whatsoever, and must
be guaranteed by a bank or trust company.  Officers of corporations and those acting in a
fiduciary or other representative capacity should file proper evidence of authority to assign the
Warrant.

---

[12] Insert "A", "B" or "C"
[13] Insert ID Number from caption on first page

EXHIBIT B

FORM OF REGISTRATION RIGHTS AGREEMENT

[see attached]

REGISTRATION RIGHTS AGREEMENT

This REGISTRATION RIGHTS AGREEMENT (the "Agreement"), dated as of _____[1], 2018 (the "Execution Date"), is entered into by and between SPYR, Inc. (the "Company"), a Nevada corporation, with its principal executive offices at 4643 South Ulster, Suite 1510, Denver, CO 80237, and Zakeni Limited (the "Investor"), a Bahamas corporation, with its principal executive offices at c/o Lodestar International Corp., Suite 100, Whitepark House, White Park House, St. Michael, Barbados BB11135.

RECITALS:

WHEREAS, pursuant to (i) the Settlement Agreement and Mutual Release, dated June 22, 2018 (the "Settlement Agreement"), between the Company and the Investor, and (ii) the Warrants (each, a "Warrant" and collectively, the "Warrants") issued by the Company to the Investor as of the date of this Agreement as contemplated by the Settlement Agreement, the Company has agreed to issue to the Investor the Warrants exercisable for shares of the Company's common stock, par value of $.0001 per share ("Common Stock"); and

WHEREAS, as an inducement to the Investor to execute and deliver the Settlement Agreement and to accept the Warrants as part of the consideration for the settlement contemplated by the Settlement Agreement, the Company has agreed to provide certain registration rights under the Securities Act of 1933, as amended, and the rules and regulations thereunder, or any similar successor statute (collectively, the "1933 Act"), and applicable state securities laws, with respect to the shares of Common Stock issuable pursuant to the Warrants.

NOW THEREFORE, in consideration of the foregoing promises and the mutual covenants contained hereinafter and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Investor hereby agree as follows:

SECTION I
DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

**"1933 Act"** shall have the meaning set forth in the recitals.

**"1934 Act"** means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder, or any similar successor statute.

**"Agreement"** shall have the meaning set forth in the preamble.

**"Claims"** shall have the meaning set forth in Section 6.1.

---

[1] Insert date of Court Order

**"Common Stock"** shall have the meaning set forth in the recitals.

**"Company"** shall have the meaning set forth in the preamble.

**"Execution Date"** shall have the meaning set forth in the preamble.

**"Indemnified Damages"** shall have the meaning set forth in Section 6.1.

**"Indemnified Party"** shall have the meaning set forth in Section 6.1.

**"Indemnified Person"** shall have the meaning set forth in Section 6.1.

**"Investor"** shall have the meaning set forth in the preamble.

**"Investor's Delay"** shall have the meaning set forth in Section 3.5.

**"New Registration Statement"** shall have the meaning set forth in Section 2.3.

**"Person"** means a corporation, a limited liability company, an association, a partnership, an organization, a business, an individual, a governmental or political subdivision thereof or a governmental agency.

**"Register," "Registered," and "Registration"** refer to the Registration effected by preparing and filing one (1) or more Registration Statements in compliance with the 1933 Act and pursuant to Rule 415 under the 1933 Act or any successor rule providing for offering securities on a continuous basis, and the declaration or ordering of effectiveness of such Registration Statement(s) by the SEC.

**"Registration Period"** shall have the meaning set forth in Section 3.1.

**"Registrable Securities"** means (i) the shares of Common Stock issuable pursuant to exercise of the Warrants, and (ii) any shares of capital stock issuable with respect to such shares of Common Stock, if any, as a result of any stock splits, stock dividends, or similar transactions, which have not been (x) previously sold pursuant to the Registration Statement that has been declared effective by the SEC, or (y) previously sold under circumstances meeting all of the applicable conditions of Rule 144 (or any similar provision then in force) under the 1933 Act.

**"Registration Default"** shall have the meaning set forth in Section 3.3.

**"Registration Statement"** means the registration statement of the Company filed under the 1933 Act covering the Registrable Securities.

**"Rule 144"** means Rule 144 promulgated under the 1933 Act or any successor rule of the SEC.

**"SEC"** shall mean the U.S. Securities and Exchange Commission.

**"Settlement Agreement"** shall have the meaning set forth in the recitals.

**"Staff"** shall have the meaning set forth in Section 2.3.

**"Violations"** shall have the meaning set forth in Section 6.1.

**"Warrant"** or **"Warrants"** shall have the meaning set forth in the recitals.

All capitalized terms used in this Agreement and not otherwise defined herein shall have the same meaning ascribed to them as in the Warrants.

SECTION II
REGISTRATION

2.1     The Company shall use its best efforts to, within sixty (60) days of the Execution Date, file with the SEC a Registration Statement or Registration Statements (as is necessary) on Form S-1 (or, if such form is unavailable for such a registration, on such other form as is available for such registration), covering the resale of the Common Stock, which Registration Statement(s) shall state that, in accordance with Rule 416 promulgated under the 1933 Act, such Registration Statement also covers such indeterminate number of additional shares of Common Stock as may become issuable upon stock splits, stock dividends or similar transactions.  The Company shall include in its registration statement, on a non-exclusive basis for resale, the Registerable Securities, except to the extent that the SEC requires the share amount to be reduced as a condition of effectiveness.

2.2     The Company shall use commercially reasonable efforts to have the Registration Statement(s) declared effective by the SEC within ninety (90) days but no more than one hundred twenty (120) days after the Company has filed the Registration Statement(s).

2.3     Notwithstanding the registration obligations set forth in Section 2.1, if the staff of the SEC (the "Staff") or the SEC informs the Company that all of the unregistered Registrable Securities cannot, as a result of the application of Rule 415, be registered for resale, the Company agrees to promptly (i) inform the Investor and use its commercially reasonable efforts to file amendments to the Registration Statement as required by the SEC and/or (ii) withdraw the Registration Statement and file a new registration statement (the "New Registration Statement"), in either case covering the maximum number of Registrable Securities permitted to be registered by the SEC, on Form S-1 to register for resale the Common Stock. If the Company amends the Registration Statement or files a New Registration Statement, as the case may be, under clauses (i) or (ii) above, the Company shall use its commercially reasonable efforts to file with the SEC, as promptly as allowed by the Staff or SEC, one or more registration statements on Form S-1 to register for resale those Registrable Securities that were not registered for resale on the Registration Statement, as amended, or the New Registration Statement. Additionally, the Company shall have the ability to file one or more New Registration Statements to cover the Registrable Securities once the Shares under the initial Registration Statement referenced in Section 2.1 have been sold.

SECTION III
RELATED OBLIGATIONS

At such time as the Company is obligated to prepare and file the Registration Statement with the SEC pursuant to Section 2, the Company shall affect the registration of the Registrable Securities in accordance with the intended method of disposition thereof and, with respect thereto, the Company shall have the following obligations:

3.1     Upon the effectiveness of such Registration Statement relating to the Registrable Securities, the Company shall keep such Registration Statement effective until the earlier to occur of the date on which (A) the Investor shall have sold all the Registrable Securities actually issued or that the Company has an obligation to issue under the Warrant; or (B) the Investor has no right to acquire any additional shares of Common Stock under the Warrant; or (C) the Investor may sell the Registrable Securities without volume limitations under Rule 144 (the "Registration Period"). The Registration Statement (including any amendments or supplements thereto and prospectuses contained therein) shall not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein, or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading. The Investor agrees to provide all information which it is required by law to provide to the Company, including the intended method of disposition of the Registrable Securities, and the Company's obligations set forth in this Agreement shall be conditioned on the receipt of such information.

3.2     The Company shall prepare and file with the SEC such amendments (including post-effective amendments) and supplements to the Registration Statement and the prospectus used in connection with such Registration Statement, which prospectus is to be filed pursuant to Rule 424 promulgated under the 1933 Act, as may be necessary to keep such Registration Statement effective during the Registration Period, and, during such period, comply with the provisions of the 1933 Act with respect to the disposition of all Registrable Securities of the Company covered by such Registration Statement until such time as all of such Registrable Securities shall have been disposed of in accordance with the intended methods of disposition by the Investor thereof as set forth in such Registration Statement.  In the event the number of shares of Common Stock covered by the Registration Statement filed pursuant to this Agreement is at any time insufficient to cover all of the Registrable Securities, the Company shall amend such Registration Statement, or file a new Registration Statement (on the short form available therefor, if applicable), or both, so as to cover all of the Registrable Securities, in each case, as soon as practicable, but in any event within thirty (30) calendar days after the necessity therefor arises (based on the then Purchase Price of the Common Stock and other relevant factors on which the Company reasonably elects to rely), assuming the Company has sufficient authorized shares at that time, and if it does not, within thirty (30) calendar days after such shares are authorized.  The Company shall use commercially reasonable efforts to cause such amendment and/or new Registration Statement to become effective as soon as practicable following the filing thereof.

3.3     As promptly as practicable after becoming aware of such event, the Company shall notify Investor in writing of the happening of any event as a result of which the prospectus included in the Registration Statement, as then in effect, includes an untrue statement of a material fact or

omission to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading ("Registration Default") and use all diligent efforts to promptly prepare a supplement or amendment to such Registration Statement and take any other necessary steps to cure the Registration Default (which, if such Registration Statement is on Form S-3, may consist of a document to be filed by the Company with the SEC pursuant to Section 13(a), 13(c), 14 or 15(d) of the 1934 Act and to be incorporated by reference in the prospectus) to correct such untrue statement or omission, and make available copies of such supplement or amendment to the Investor.  The Company shall also promptly notify the Investor (i) when a prospectus or any prospectus supplement or post-effective amendment has been filed, and when the Registration Statement or any post-effective amendment has become effective; (ii) of any request by the SEC for amendments or supplements to the Registration Statement or related prospectus or related information, (iii) of the Company's reasonable determination that a post-effective amendment to the Registration Statement would be appropriate, (iv) in the event the Registration Statement is no longer effective, or (v) if the Registration Statement is stale as a result of the Company's failure to timely file its financials or otherwise

3.4     The Company shall use all commercially reasonable efforts to prevent the issuance of any stop order or other suspension of effectiveness of the Registration Statement, or the suspension of the qualification of any of the Registrable Securities for sale in any jurisdiction and, if such an order or suspension is issued, to obtain the withdrawal of such order or suspension at the earliest possible moment and to notify the Investor holding Registrable Securities being sold of the issuance of such order and the resolution thereof or its receipt of actual notice of the initiation or threat of any proceeding concerning the effectiveness of the Registration Statement.

3.5     The Company shall permit the Investor and one (1) legal counsel, designated by the Investor, at Company's expense (not to exceed $2,000 to the Company), to review and comment upon the Registration Statement and all amendments and supplements thereto at least one (1) calendar day prior to their filing with the SEC.  The Company's obligation to pay for such expense of Investor's counsel shall be limited to review of one Registration Statement or Amendment; however, such limitation shall not alter Investor's rights hereunder to have counsel review multiple Registration Statements or Amendments at Investor's sole cost and expense.  In the event Investor's counsel requests any changes to the way in which information about the Investor or the Warrants is presented in the Registration Statement or Amendment, Company shall cooperate with Investor's counsel in making any reasonably requested revisions thereto in a timely manner.  The event(s) of an Investor's Delay shall act to suspend all obligations of any kind or nature of the Company under any and all agreements of any nature or kind between the Company and the Investor.

3.6     The Company shall hold in confidence and not make any disclosure of information concerning the Investor unless (i) disclosure of such information is necessary to comply with federal or state securities laws, (ii) the disclosure of such information is necessary to avoid or correct a misstatement or omission in any Registration Statement, (iii) the release of such information is ordered pursuant to a subpoena or other final, non-appealable order from a court or governmental body of competent jurisdiction, or (iv) such information has been made generally available to the public other than by disclosure in violation of this Agreement or any

other agreement.  The Company agrees that it shall, upon learning that disclosure of such information concerning the Investor is sought in or by a court or governmental body of competent jurisdiction or through other means, give prompt written notice to the Investor and allow the Investor, at the Investor's expense, to undertake appropriate action to prevent disclosure of, or to obtain a protective order covering such information.

3.7     The Company shall use all commercially reasonable efforts to maintain designation and quotation of all the Registrable Securities covered by any Registration Statement on the Principal Market. If, despite the Company's commercially reasonable efforts, the Company is unsuccessful in satisfying the preceding sentence, it shall use commercially reasonable efforts to cause all the Registrable Securities covered by any Registration Statement to be listed on each other national securities exchange and automated quotation system, if any, on which securities of the same class or series issued by the Company are then listed, if any, if the listing of such Registrable Securities is then permitted under the rules of such exchange or system.  The Company shall pay all fees and expenses in connection with satisfying its obligation under this Section 3.7.

3.8     If requested by the Investor, the Company shall (i) as soon as reasonably practical incorporate in a prospectus supplement or post-effective amendment such information as the Investor reasonably determines should be included therein relating to the sale and distribution of Registrable Securities, including, without limitation, information with respect to the offering of the Registrable Securities to be sold in such offering; (ii) make all required filings of such prospectus supplement or post-effective amendment as soon as reasonably possible after being notified of the matters to be incorporated in such prospectus supplement or post-effective amendment; and (iii) supplement or make amendments to any Registration Statement if reasonably requested by the Investor.

3.9     The Company shall use all commercially reasonable efforts to cause the Registrable Securities covered by the applicable Registration Statement to be registered with or approved by such other governmental agencies or authorities as may be necessary to facilitate the disposition of such Registrable Securities.

3.10    The Company shall otherwise use all commercially reasonable efforts to comply with all applicable rules and regulations of the SEC in connection with any registration hereunder.

3.11    The Company shall take all other reasonable actions necessary to expedite and facilitate disposition by the Investor of Registrable Securities pursuant to the Registration Statement.

SECTION IV
OBLIGATIONS OF THE INVESTOR

4.1     At least five (5) calendar days prior to the first anticipated filing date of the Registration Statement, the Company shall notify the Investor in writing of the information the Company requires from the Investor for the Registration Statement.  It shall be a condition precedent to the obligations of the Company to complete the registration pursuant to this Agreement with respect to the Registrable Securities and the Investor agrees to furnish to the Company that information regarding itself, the Registrable Securities and the intended method of disposition of the

Registrable Securities as shall reasonably be required to effect the registration of such Registrable Securities and the Investor shall execute such documents in connection with such registration as the Company may reasonably request.  The Investor covenants and agrees that, in connection with any sale of Registrable Securities by it pursuant to the Registration Statement, it shall comply with the "Plan of Distribution" section of the then current prospectus relating to such Registration Statement.

4.2     The Investor, by its acceptance of the Registrable Securities, agrees to cooperate with the Company as reasonably requested by the Company in connection with the preparation and filing of any Registration Statement hereunder, unless the Investor has notified the Company in writing of an election to exclude all of the Investor's Registrable Securities from such Registration Statement.

4.3     The Investor agrees that, upon receipt of written notice from the Company of the happening of any event of the kind described in Section 3.4 or the first sentence of Section 3.3, the Investor will immediately discontinue disposition of Registrable Securities pursuant to any Registration Statement(s) covering such Registrable Securities until the Investor's receipt of the copies of the supplemented or amended prospectus contemplated by Section 3.4 or the first sentence of Section 3.3.

SECTION V
EXPENSES OF REGISTRATION

All expenses related to the registration shall be paid by the Company, including without limitation legal expenses and SEC filing fees.

SECTION VI
INDEMNIFICATION

In the event any Registrable Securities are included in the Registration Statement under this Agreement:

6.1     To the fullest extent permitted by law, the Company, under this Agreement, will, and hereby does, indemnify, hold harmless and defend the Investor who holds Registrable Securities, the directors, officers, partners, employees, counsel, agents, representatives of, and each Person, if any, who controls, any Investor within the meaning of the 1933 Act or the 1934 Act (each, an "Indemnified Person"), against any losses, claims, damages, liabilities, judgments, fines, penalties, charges, costs, attorneys' fees, amounts paid in settlement or expenses, joint or several (collectively, "Claims"), incurred in investigating, preparing or defending any action, claim, suit, inquiry, proceeding, investigation or appeal taken from the foregoing by or before any court or governmental, administrative or other regulatory agency, body or the SEC, whether pending or threatened, whether or not an indemnified party is or may be a party thereto ("Indemnified Damages"), to which any of them may become subject insofar as such Claims (or actions or proceedings, whether commenced or threatened, in respect thereof) arise out of or are based upon: (i) any untrue statement or alleged untrue statement of a material fact in the Registration Statement or any post-effective amendment thereto, or the omission or alleged omission to state

a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which the statements therein were made, not misleading, (ii) any untrue statement or alleged untrue statement of a material fact contained in the final prospectus (as amended or supplemented, if the Company files any amendment thereof or supplement thereto with the SEC) or the omission or alleged omission to state therein any material fact necessary to make the statements made therein, in light of the circumstances under which the statements therein were made, not misleading, or (iii) any violation or alleged violation by the Company of the 1933 Act, the 1934 Act, any other law, including, without limitation, any state securities law, or any rule or regulation thereunder relating to the offer or sale of the Registrable Securities pursuant to the Registration Statement (the matters in the foregoing clauses (i) through (iii) being, collectively, "Violations").   Notwithstanding anything to the contrary contained herein, the indemnification agreement contained in this Section 6.1: (i) shall not apply to a Claim arising out of or based upon a Violation that is due to the inclusion in the Registration Statement of the information furnished to the Company by any Indemnified Person expressly for use in connection with the preparation of the Registration Statement or any such amendment thereof or supplement thereto; (ii) shall not be available to the extent such Claim is based on: (a) a failure of the Investor to deliver or to cause to be delivered the prospectus made available by the Company; or (b) the Indemnified Person's use of an incorrect prospectus despite being advised in advance by the Company in writing not to use such incorrect prospectus; (iii) any claims based on the manner of sale of the Registrable Securities by the Investor or of the Investor's failure to register as a dealer under applicable securities laws; (iv) any failure of the Investor to notify the Company of any material fact that should be stated in the Registration Statement or prospectus relating to the Investor or the manner of sale; or (v) any amounts paid in settlement of any Claim if such settlement is effected without the prior written consent of the Company, which consent shall not be unreasonably withheld. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of the Indemnified Person and shall survive the resale of the Registrable Securities by the Investor pursuant to the Registration Statement.

6.2     In connection with any Registration Statement in which Investor is participating, the Investor agrees to indemnify, hold harmless and defend, to the same extent and in the same manner as is set forth in Section 6.1,  the Company, each of its directors, each of its officers who signs the Registration Statement, each Person, if any, who controls the Company within the meaning of the 1933 Act or the 1934 Act and the Company's agents (collectively and together with an Indemnified Person, an "Indemnified Party"), against any Claim or Indemnified Damages to which any of them may become subject, under the 1933 Act, the 1934 Act or otherwise, insofar as such Claim or Indemnified Damages arise out of or are based upon any Violation, in each case to the extent, and only to the extent, that such Violation is due to the inclusion in the Registration Statement of the written information furnished to the Company by the Investor expressly for use in connection with such Registration Statement; provided, however, that the indemnity agreement contained in this Section 6.2 shall not apply to amounts paid in settlement of any Claim if such settlement is effected without the prior written consent of the Investor, which consent shall not be unreasonably withheld. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of such Indemnified Party and shall survive the resale of the Registrable Securities by the Investor pursuant to the Registration Statement. Notwithstanding anything to the contrary contained herein, the indemnification agreement contained in this Section 6.2 with respect to any preliminary

prospectus shall not inure to the benefit of any Indemnified Party if the untrue statement or omission of material fact contained in the preliminary prospectus were corrected on a timely basis in the prospectus, as then amended or supplemented.

6.3     Promptly after receipt by an Indemnified Person or Indemnified Party under this Section 6 of notice of the commencement of any action or proceeding (including any governmental action or proceeding) involving a Claim, such Indemnified Person or Indemnified Party shall, if a Claim in respect thereof is to be made against any indemnifying party under this Section 6, deliver to the indemnifying party a written notice of the commencement thereof, and the indemnifying party shall have the right to participate in, and, to the extent the indemnifying party so desires, jointly with any other indemnifying party similarly noticed, to assume control of the defense thereof with counsel mutually satisfactory to the indemnifying party and the Indemnified Person or the Indemnified Party, as the case may be; provided, however, that an Indemnified Person or Indemnified Party shall have the right to retain its own counsel with the fees and expenses to be paid by the indemnifying party, if, in the reasonable opinion of counsel retained by the Indemnified Person or Indemnified Party, the representation by counsel of the Indemnified Person or Indemnified Party and the indemnifying party would be inappropriate due to actual or potential differing interests between such Indemnified Person or Indemnified Party and any other party represented by such counsel in such proceeding. The indemnifying party shall pay for only one (1) separate legal counsel for the Indemnified Persons or the Indemnified Parties, as applicable, and such counsel shall be selected by the Investor, if the Investor is entitled to indemnification hereunder, or the Company, if the Company is entitled to indemnification hereunder, as applicable. The Indemnified Party or Indemnified Person shall cooperate fully with the indemnifying party in connection with any negotiation or defense of any such action or Claim by the indemnifying party and shall furnish to the indemnifying party all information reasonably available to the Indemnified Party or Indemnified Person which relates to such action or Claim. The indemnifying party shall keep the Indemnified Party or Indemnified Person fully apprised at all times as to the status of the defense or any settlement negotiations with respect thereto. No indemnifying party shall be liable for any settlement of any action, claim or proceeding affected without its written consent, provided, however, that the indemnifying party shall not unreasonably withhold, delay or condition its consent. No indemnifying party shall, without the consent of the Indemnified Party or Indemnified Person, consent to entry of any judgment or enter into any settlement or other compromise which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party or Indemnified Person of a release from all liability in respect to such Claim. Following indemnification as provided for hereunder, the indemnifying party shall be subrogated to all rights of the Indemnified Party or Indemnified Person with respect to all third parties, firms or corporations relating to the matter for which indemnification has been made. The failure to deliver written notice to the indemnifying party within a reasonable time of the commencement of any such action shall not relieve such indemnifying party of any liability to the Indemnified Person or Indemnified Party under this Section 6, except to the extent that the indemnifying party is prejudiced in its ability to defend such action.

6.4     The indemnity agreements contained herein shall be in addition to (i) any cause of action or similar right of the Indemnified Party or Indemnified Person against the indemnifying party or others, and (ii) any liabilities the indemnifying party may be subject to pursuant to the law.

SECTION VII

7.1   **Assignment of the Registration Rights**.   The rights to have the Company register Registrable Securities pursuant to this Agreement and the rights of the Holder under Section 8 hereof shall be automatically assigned by the Holder to any transferee of the Registrable Securities (excluding any transfer of such Registrable Securities by a sale pursuant to an effective Registration Statement or pursuant to Rule 144) , but only if, within a reasonable time after such transfer or assignment, the Company is furnished with written notice of: (a) the name and address of such transferee or assignee; (b) the securities with respect to which such registration rights are being transferred or assigned; and (c) written evidence of the transferee's assumption of the Holder's obligations under this Agreement.

7.2   **Amendment of Registration Rights**.   Any provision of this Agreement may be amended, and the observance thereof may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company and Holders who represent a Majority in Interest of the Holders as of the relevant date.   Any amendment or waiver effected in accordance with this Section 7 shall be binding upon each Holder and the Company.

SECTION VIII
REPORTS UNDER THE 1934 ACT

8.1   After the Execution Date of the Registration Statement and with a view to making available to the Investor the benefits of Rule 144 that may at any time permit the Investor to sell securities of the Company to the public without registration, provided that the Investor holds any Registrable Securities that are eligible for resale under Rule 144, the Company agrees to:

a.   make and keep public information available, as those terms are understood and defined in Rule 144;

b.   file with the SEC in a timely manner all reports and other documents required of the Company under the 1933 Act and the 1934 Act so long as the Company remains subject to such requirements and the filing of such reports and other documents is required for the applicable provisions of Rule 144; and

c.   furnish to the Investor, promptly upon request, (i) a written statement by the Company that it has complied with the reporting requirements of Rule 144, the 1933 Act and the 1934 Act, as applicable, and (ii) such other information as may be reasonably requested to permit the Investor to sell such securities pursuant to Rule 144 without registration.

d.   at the request of any Holder holding Registrable Securities (a "Holder"), give its Transfer Agent instructions (supported by an opinion of Company Counsel or other counsel to the Company, if required or requested by the Transfer Agent) to the effect that, upon the Transfer Agent's receipt from such Holder of

(i) a certificate (a "Rule 144 Certificate") certifying (A) that the Holder's holding period (as determined in accordance with the provisions of Rule 144) for the shares of Registrable Securities which the Holder proposes to sell (the "Securities Being Sold") is not less than (1) year and (B) as to such other matters as may be appropriate in accordance with Rule 144 under the Securities Act, and

(ii) an opinion of counsel acceptable to the Company (for which purposes it is agreed that Krieger & Prager LLP shall be deemed acceptable if not given by Company Counsel; provided, however, that the Company shall reimburse the Holder for, or the Company shall directly pay, the fees for the issuance of such opinion by such counsel, not to exceed $500.00) that, based on the Rule 144 Certificate, Securities Being Sold may be sold pursuant to the provisions of Rule 144, even in the absence of an effective Registration Statement,

the Transfer Agent is to effect the transfer of the Securities Being Sold and issue to the buyer(s) or transferee(s) thereof one or more stock certificates representing the transferred Securities Being Sold without any restrictive legend and without recording any restrictions on the transferability of such shares on the Transfer Agent's books and records (except to the extent any such legend or restriction results from facts other than the identity of the Holder, as the seller or transferor thereof, or the status, including any relevant legends or restrictions, of the shares of the Securities Being Sold while held by the Holder). If the Transfer Agent reasonably requires any additional documentation at the time of the transfer, the Company shall deliver or cause to be delivered all such reasonable additional documentation as may be necessary to effectuate the issuance of an unlegended certificate.

## SECTION IX
## MISCELLANEOUS

9.1    NOTICES.  Any notices or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered (i) upon receipt, when delivered personally; (ii) upon receipt, when sent by electronic mail (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending party); or (iii) one (1) day after deposit with a nationally recognized overnight delivery service, in each case properly addressed to the party to receive the same. The addresses and email addresses for such communications shall be:

If to the Company:

> Attention:  James R. Thompson, Chief Executive Officer
> 4643 S. Ulster Street, Suite 1510
> Denver, Colorado 80237
> Facsimile: (303) 991-8001
> E-mail: jthompson@spyr.com

with a copy to:

      Mailander Law Office, Inc.
      835 5th Avenue, Ste. 312
      San Diego, CA 92101
      Facsimile: (619) 537-7193
      E-mail: tmailander@gmail.com
      Attention: Tad Mailander

If to the Holder:

      Zakeni Limited
      c/o Lodestar International Corp.
      Suite 100, Whitepark House
      White Park House
      St. Michael, Barbados BB11135
      Facsimile: : 246-429-2677
      Email: ssalcman@lodestar.bb
      Attention: Sheldon Salcman, President

with a copy to:

      Krieger & Prager LLP
      39 Broadway, Suite 920
      New York, New York 10006
      Attention: Samuel M. Krieger, Esq.
      Facsimile: (212) 363-2999

Each party shall provide five (5) business days' prior written notice to the other party of any change in address or email address.

9.2    NO WAIVERS.  Failure of any party to exercise any right or remedy under this Agreement or otherwise, or delay by a party in exercising such right or remedy, shall not operate as a waiver thereof.

9.3    ENTIRE AGREEMENT/AMENDMENT.  This Agreement and the Warrants (collectively, the "Transaction Documents") constitute the entire agreement among the parties hereto with respect to the subject matter hereof and thereof.  There are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein and therein.  The Transaction Documents supersede all prior agreements and understandings among the parties hereto with respect to the subject matter hereof and thereof.  The provisions of this Agreement may be amended only with the written consent of the Company and Investor.

9.4    HEADINGS.  The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.  Whenever required by the context of this Agreement, the singular shall include the plural and masculine shall include the feminine. This

Agreement shall not be construed as if it had been prepared by one of the parties, but rather as if all the parties had prepared the same.

9.5     COUNTERPARTS.  This Agreement may be executed in any number of counterparts and by the different signatories hereto on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute but one and the same instrument. This Agreement may be executed by facsimile transmission, PDF, electronic signature or other similar electronic means with the same force and effect as if such signature page were an original thereof.

9.6     FURTHER ASSURANCES.  Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

9.7     SEVERABILITY.   In case any provision of this Agreement is held by a court of competent jurisdiction to be excessive in scope or otherwise invalid or unenforceable, such provision shall be adjusted rather than voided, if possible, so that it is enforceable to the maximum extent possible, and the validity and enforceability of the remaining provisions of this Agreement will not in any way be affected or impaired thereby.

9.8     LAW GOVERNING THIS AGREEMENT.  This Agreement shall be governed by, and construed and interpreted in accordance with, the substantive laws of the State of New York, without giving effect to any conflict of laws rule or principle that might require the application of the laws of another jurisdiction.  Any dispute, claim, suit, action or other legal proceeding arising out of the transactions contemplated by this Agreement or the rights and obligations of each of the parties shall be brought only in a competent court in New York, New York, or in the federal courts of the United States of America located in New York, New York.  The parties to this Agreement hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon forum non conveniens. The parties executing this Agreement and other agreements referred to herein or delivered in connection herewith agree to submit to the in personam jurisdiction of such courts.  The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs. In the event that any provision of this Agreement or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law.  Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement. **THE PARTIES HEREBY WAIVE ALL RIGHTS TO A TRIAL BY JURY.**

*[Balance of page intentionally left blank]*

9.9     NO THIRD PARTY BENEFICIARIES. This Agreement is intended for the benefit of the parties hereto and is not for the benefit of, nor may any provision hereof be enforced by, any other person.


Your signature on this Signature Page evidences your agreement to be bound by the terms and conditions of the Registration Rights Agreement as of the date first written above.  The undersigned signatory hereby certifies that he has read and understands the Registration Rights Agreement, and the representations made by the undersigned in this Registration Rights Agreement are true and accurate and agrees to be bound by its terms.

ZAKENI LIMITED


By: _____
Name: Sheldon Salcman
Title: President

SPYR, INC.


By: _____
Name: James R. Thompson
Title: Chief Executive Officer

EXHIBIT C

FORM OF IRREVOCABLE INSTRUCTIONS TO TRANSFER AGENT

[see provisions of Section 4(c)]

EXHIBIT D

JOINT MOTION FOR ORDER
AND
ORDER OF DISMISSAL WITH PREJUDICE IN THE LAWSUIT

[see attached]

# UNITED STATES DISTRICT COURT

## DISTRICT OF DELAWARE

_____X

ZAKENI LIMITED,                                     CIVIL ACTION NO.

                              Plaintiff,                    1:15-CV-00926(UNA)


                -against-                         _____, 2018

SPYR, INC., f/k/a EAT AT JOE'S, LTD.,

                           Defendant.

_____X

## JOINT MOTION FOR ORDER APPROVING SETTLEMENT AGREEMENT

Plaintiff, ZAKENI LIMITED ("ZAKENI"), and Defendant, SPYR, INC. ("SPYR") (collectively, the "Parties"), hereby request this Court for an Order, in the proposed form annexed hereto as Exhibit A, pursuant to 15 U.S.C. 77c(a)(10), after a hearing, dismissing this action with prejudice and approving the fairness of the terms and conditions of the issuance of common stock and warrants of SPYR pursuant to a Settlement Agreement and Mutual Release entered into between the Parties ("Settlement Agreement"), a copy of which is annexed hereto as Exhibit B, and otherwise approving the Settlement Agreement. In support of this motion, the Parties represent as follows:

1.        The Parties have entered into a Settlement Agreement that resolves all issues in the case, a copy of which is annexed hereto as Exhibit. B. The Parties hereby respectfully request a hearing (the "Hearing") on this motion be scheduled at the Court's earliest convenience.

2.      The Hearing upon this motion and the requested Order is sought so that the delivery by SPYR to, and the resale in the United States by, ZAKENI of the shares (as referred to in  the Settlement Agreement and defined therein, and also hereinafter referred to, as the "Shares") and the issuance by SPYR to ZAKENI of the warrants (as referred to in  the Settlement Agreement and defined therein, and also hereinafter referred to, as the "Warrants") will be exempt from registration under the Securities Act of 1933, as amended (the "Securities Act"), pursuant to Section 3(a)(10) of the Securities Act, 15 U.S.C. 77c(a)(10).  See SEC Staff Legal Bulletin No. 3A (June 2008) and e.g., Brucker v Thyssen-Bornemisza Europe N.V., 424 F.Supp. 679 (S.D.N.Y. 1976), cert. denied, 434 U.S. 897 (1977); Continental Assurance Co. v Macleod-Stedman, Inc., 694 F.Supp. 449 (N.D. Ill. 1988).

3.      ZAKENI is the only party to whom the Shares and Warrants will be issued. ZAKENI has been represented by and advised by counsel throughout these proceedings, the settlement negotiations and the preparation and execution of the Settlement Agreement. ZAKENI, through its counsel, consents to the entry of the requested Order and the issuance of the Shares and the Warrants pursuant to the terms and conditions set forth in the Settlement Agreement.  As such, the Settlement Agreement is clearly fair to ZAKENI.

4.      The Parties request that the Settlement Agreement be incorporated into and made an order of the court, with the court dismissing the case with prejudice and retaining jurisdiction to enforce any violations of the Settlement Agreement.

WHEREFORE, the Parties respectfully request that a hearing regarding the annexed proposed Order Granting Approval of Settlement Agreement and Dismissal With Prejudice be scheduled and that, upon the Hearing, the Order be granted in its entirety.

Respectfully Submitted

OF COUNSEL:
Evan M. Newman, Esq.
JACOBOWITZ NEWMAN TVERSKY LLP
377 Pearsall Avenue, Suite C
Cedarhurst, NY 11516
(516) 545-0343
enewman@jntlllp.com

Evan O. Williford (No. 4162)
Andrew J. Huber (No. 6043)
THE WILLIFORD FIRM LLC
901 N. Market Street, Suite 800
Wilmington, DE  19801
(302) 654-5924
evanwilliford@thewillifordfirm.com
ajhuber@thewillifordfirm.com
  *Attorneys for Plaintiff*

[Signature block]
[Attorneys for Defendant]

# UNITED STATES DISTRICT COURT

# DISTRICT OF DELAWARE

_____X

ZAKENI LIMITED,                                                      CIVIL ACTION NO.

                                  Plaintiff,                    1:15-CV-00926(UNA)


                -against-                                        _____, 2018

SPYR, INC., f/k/a EAT AT JOE'S, LTD.,

                               Defendant.

_____X


## ORDER GRANTING APPROVAL OF SETTLEMENT AGREEMENT AND DISMISSAL WITH PREJUDICE


       This matter having come for a hearing on the ___ day of _____, 2018 pursuant to the Joint Motion of the Parties to approve the Settlement Agreement entered into as of June __, 2018 between Plaintiff, ZAKENI LIMITED ("ZAKENI"), and Defendant, SPYR, INC. ("SPYR", and collectively with ZAKENI, the "Parties"), and the Court having reviewed the Joint Motion and the terms and conditions of the Settlement Agreement and being otherwise fully advised on the premises, the Court hereby finds as follows:

       1.      The Court has been advised that the Parties intend that the issuance of the Shares (as defined by the Settlement Agreement and, also referred to hereinafter as the "Shares") and of the Warrants (as defined by the Settlement Agreement and, also referred to hereinafter as the "Warrants") to ZAKENI, and the resale of the Shares by ZAKENI in the United States, assuming satisfaction of all other applicable securities laws and regulations, will be exempt from

registration under the Securities Act of 1933, as amended (the "Securities Act"), in reliance upon Section 3(a)(10) of the Securities Act, and, based upon this Court's finding herein that the terms and conditions of the issuance of the Shares and the Warrants by SPYR to ZAKENI are fair to ZAKENI, the Parties will effectuate the Settlement Agreement resolving all issues between them and pending before the court;

2.      The hearing having been scheduled upon the consent of ZAKENI and SPYR, ZAKENI having had adequate notice of the hearing, and ZAKENI being the only party to whom the Shares and the Warrants will be issued pursuant to the Settlement Agreement, the Parties desire that the Settlement Agreement be made an Order of the Court, with the Court retaining jurisdiction to enforce the Settlement Agreement;

3.      The terms and conditions of the issuance of the Shares and the Warrants in exchange for the release of certain claims as set forth in the Settlement Agreement are fair to ZAKENI, the only party to whom the Shares and the Warrants will be issued;

4.      The fairness hearing was open to ZAKENI.  ZAKENI was represented by counsel at the hearing who acknowledged that adequate notice of the hearing was given and consented to the entry of this order.

It is therefore ORDERED AND ADJUDGED that the Settlement Agreement is hereby approved as fair to the party to whom the Shares and the Warrants will be issued, within the meaning of Section 3(a)(10) of the Securities Act, and that the issuance of the Shares to, and the resale of the Shares in the United States, assuming satisfaction of all other applicable securities laws and regulations, by, ZAKENI and the issuance of the Warrants to ZAKENI will be exempt from registration under the Securities Act and made an order of this Court, with the Court retaining jurisdiction to enforce the terms of the Settlement Agreement, and that the within Action shall be dismissed with prejudice.

SO ORDERED, this _____ day of _____, 2018.


_____
The Honorable Gerald Austin McHugh, U.S.D.J.